ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| G.    A    by and through<br>her parents and next friends<br>**William and Maureen Anello**<br>**362 Alba Court**<br>**West Grove, PA 19390**<br>**Chester County, Pennsylvania** | * | |
| | * | |
| | * | |
| | * | 07 - 508 |
| **Plaintiffs** | | Civil Action No. _____ |
| v. | * | |
| **Indian River School District**<br>**Serve On:** | * | |
| **Susan S. Bunting (officially)**<br>**31 Hoosier St.**<br>**Selbyville, DE 19975**<br>**Sussex County, Delaware** | * | |
| | * | |
| **and** | * | |
| **Susan S. Bunting (officially)**<br>**Superintendent of Schools**<br>**Indian River School District** | * | |
| | * | |
| **Defendants** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

FILED
2007 AUG 20 PM 1:46
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## COMPLAINT FOR MONETARY DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

### *JURISDICTION*

This Honorable Court has jurisdiction over this matter pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §1400 *et seq.,* Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §794 *et seq.*, 42 U.S.C. § 1983 ("Section 1983") and 28 U.S.C. §§1331 and 1343. This Court has pendant jurisdiction pursuant to 14 Del. C. § 3100 *et seq.* Plaintiffs bring this Complaint seeking review of a decision of a Delaware Department of Education Due Process Hearing Panel, rendered on August 1, 2007, and transmitted by the Panel to the parties on August 1, 2007.

### *PARTIES*

1.      G      A      is a minor child (DOB:      /1995) who is disabled as that term is defined by the IDEA and Section 504 and who, at all times relevant to this action, resided in the Indian River School District in Sussex County, Delaware. William Anello and Maureen Anello ("the parents") are the parents of G      A ("      ") and, at all times relevant to this action, resided in the Indian River School District in Sussex County, Delaware.

2.      Indian River School District ("IRSD") is a local educational agency as defined by 20 U.S.C. §1401 and is responsible for complying with federal law and state law with respect to the provision of a free appropriate public education ("FAPE") to disabled children residing in the district.

3.      Susan S. Bunting (the "Superintendent") is the Superintendent of the local

educational agency in charge of providing a FAPE to disabled children residing in the Indian River School District. She is responsible for ensuring that the local educational agency acts in accordance with the law in the delivery of special education and related services to disabled children within the agency's jurisdiction. She is sued in her official capacity.

### STATEMENT OF FACTS

4.      This case was remanded to a Delaware Department of Education Due Process Hearing Panel by Family Court of the State of Delaware in and for Sussex County on January 19, 2007 by the Honorable Kenneth M. Millman.

5.      Mr. & Mrs. Anello and their children move from the White Plains School District, New York to Ocean View, Delaware and into the IRSD the summer of 2003.

6.      G      A      is a child with a specific learning disability that affects her ability to read, write, and process language. She has been diagnosed with Anxiety Disorder, Central Auditory Processing Disorder, and Sensory Integration Disorder. She was first identified as learning disabled during the 2002-2003 school year, when she was in second grade. At that time,      and her parents were not living in the Indian River School District.

7. On or before August 6th, 2003 G      was enrolled as a 3rd grade student with a disability and transferring 504 plan of which included accommodations, related services, and therapist/ teacher consultations into Lord Baltimore School for the 2003-2004 school year.

3

8. The district held a 504 meeting without the Parents to discuss the NY 504 plan on or before September 15, 2003.

9. The District failed to follow district protocol and did not perform formal or informal testing and/or assessments prior to development and completion of Gabbie's IRSD 504 plan.

10. IRSD presented their completed 504 plan to the parents on September 22nd, 2003 which included minimal classroom accommodations and no related services.

11. Parent's 1st requested testing for G      on September 22, 2003, and the district provided some occupational therapy related testing.

12.    On September 22, 2003, G      classroom teacher was assigned by the IRSD 504 coordinator to monitor Gabbie's academic performance for any signs indicating lack of appropriate progress or regression and report them to the 504 coordinator.

13.    The district and the 3rd grade teacher requested the parents seek outside tutoring to address G      lack of expected progress in Math and Reading during the first marking period of the 2003-2004 school year.

14.    On January 19, 2004 the Parent alerted the district that G      was still having

difficulty comprehending the 3rd grade curriculum and requested a meeting to review the student's 504 plan.

15.    By letters sent to the parents on or about February 3rd, and April 8th, 2004, the district determined G        was failing the regular education 3rd grade curriculum and was in danger of being retained.

16.    By June 11th, 2004, the district provided the parents formal notice that they had indeed decided to deny G        promotion to the 4th grade due to her failure to make sufficient progress towards the state standard and achieve passing grades in the 3rd grade curriculum.

17. The district did not take any appropriate actions to determine why G        a child it identified as having a disability in September of 2003, was failing her 2003-2004 3rd grade year until May 2004.

18.    At the June 14th, 2004, IDEA eligibility meeting the district psychologist reported G        disability adversely affected her education and classified her as a student with a Learning Disability.

19. On July 9th, 2004, the district convened an IEP development meeting and offered a typed copy of accommodations, goals, objectives, and placement as determined by the district for the 2004-05 school year IEP to G        parent for signature.

20.  On or about July 12, 2004, the parents contacted Darlene St. Peters and expressed their concerns with the IEP programs and she refused to review or revise the programs and services of the district's 2004/2005 IEP.

21.  Parent marked in rejection to the district's proposed IEP on or about July 21, 2004.

22.  On or about August 20, 2004, parents provided the district of their decision to unilaterally place G       in Lighthouse Christian School.

23.  On or about August 31, 2004, parent filed a request for a due process hearing with the Dept. of Education.

24.    A due process hearing was held on January 20, 24, February 15, March 15, and 17, 2005.

25.    The hearing panel issued a decision in favor of IRSD.  The decision is dated June 30, 2005 and transmitted by the Panel to the parties on June 29, 2005.

26.    The parents appealed the decision to Sussex County Family Court on September 27, 2005.

27.    The court reversed the panel's decision and the case was remanded to a due process educational panel for the purpose of determining if the district timely identified

G⸱      as a special needs student for the 2003-204 school year, whether the district provided G⸱      with an appropriate IEP for the 2004-2005 school year and if the IRSD failed to satisfy either obligation, the panel shall decide an appropriate remedy.

28.    The remanded due process hearing was held on May 24 and 30, 2007.

29.    The hearing panel issued a split decision in part favor for the parent and in favor of IRSD. The decision dated August 1, 2007, and transmitted to the parties by email on August 1, 2007.

30.    The due process educational panel found the district failed to identify the student as a student in need of special education services in a timely manner for the reasons more specifically stated above. The proposed IEP was reasonably calculated to provide the student with meaningful education benefit, the request for private placement is denied as the appropriate placement for this child was in the IRSD. The IRSD School shall reimburse the parents for out of pocket expenses as more specifically stated above.

### *ISSUES FOR JUDICIAL REVIEW*

31.    As the funding agencies, IRSD had a duty to timely identify G⸱      as a disabled student and timely provide her with an IEP for the 2003-04 school year. 20 U.S.C. § 1414(d) (4) (A) (i). IRSD failed to do so.

7

32.     The IRSD as of September 15, 2003, failed to provide all the appropriate evaluations by qualified trained and knowledgeable personnel necessary to identify all her disabilities.  34 C.F.R. §300.531-300.536

33.     The IRSD violated the parent's rights when they did not provide a copy of the evaluation report from their speech and language therapist.

34.     IRSD had an obligation to offer a FAPE to G       , through an IEP that at the time it was developed should have been calculated for her to receive meaningful educational benefit and more than *di-minimus*.  20 U.S.C. § 1414(d) (2) (A) *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F .2d 171, 180 (3d Cir.1988).  IRSD failed to meet this obligation.  The Due Process Hearing Panel erred as a matter of law by finding that the proposed draft IEP was a work in progress in need of modifications and the District was not required to provide a completely developed IEP calculated to provide meaningful educational benefit by the first day of the new school year.  *Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176, 102 S. Ct. 3034, 73 L.Ed2d. 690 (1982).

35.     The IRSD first determined G       placement prior to program and then developed a program to conform the placement.

36.     By failing to develop an appropriate IEP, IRSD failed to offer G     a free appropriate public education by the beginning of the 2004-05 school year.  The parents thus had no choice but to place G       at Lighthouse Christian School.

37.    IDEA and §504 34 CFR 300.125 "Child Find", IDEA 20 USC & Delaware Code §3122 was not properly interpreted by the Due Process Hearing Panel.

38.    The Due Process Hearing Panel erred by failing to apply the appropriate law, either case or statute as they related to the case in question.

39.    The Due Process Hearing Panel erred by impeding facts not entered into the transcripts by either witnesses, testimony or within any of the evidence disclosures.

40.    The Due Process Hearing Panel misinterpreted Federal Rule of Evidence # 401 and 702 thus prohibited the parents from presenting any evidence to support their claim of appropriate remedy and as such denied the parents right to due process.

41.    The Due Process Hearing Panel erred as a matter of law when they failed to include in their decision, the position of the parents including their major points of presentation.

### *RELIEF REQUESTED*

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court:

a.    Enter a finding that the District did not offer a free appropriate public education to G        A      because they failed to timely "Child Find" for the 2003-2004 school year,

b.    Enter a finding that the 2004-2005 IEP was not appropriately calculated to

9

provide G:        meaningful educational benefit and FAPE

  c.  ORDER the Defendants to reimburse the parents for the tuition, and related expenses of the Lighthouse Christian School for the 2004-2005, school year for their failure to offer FAPE, through an individualized educational program calculated to provide meaningful educational benefit.

  d.  ORDER the District to provide as compensatory education for the 2003-2004 school year as recommended by the most recent evaluator separate private education tuition and all related costs for enrollment in an intensive remedial language based program designed to address all her unique needs in a small group setting and continuing until such time as G        achievement is commensurate with her age appropriate peers.

  e.  ORDER the Defendants to reimburse the parents for the costs of expert witness fees and other litigation expenses related to the administrative hearing and this action; and

  f.  ORDER such other and further relief as the nature of this case and justice require.

RESPECTFULLY SUBMITTED,

Maureen Anello<br>
*Pro Se litigant*<br>
362 Alba Court<br>
West Grove, PA 19309<br>
(484) 667-8162

Date: Aug. 20, 2007

10

ORIGINAL

**BEFORE THE SPECIAL EDUCATION DUE PROCESS HEARING PANEL**

**DUE PROCESS HEARING FOR THE INDIAN RIVER SCHOOL DISTRICT**

07 - 5 0 8

**IN RE THE MATTER OF:**              )
                                     )        DE DP 05-2 & 07-20
G          ; Al                      )

**DECISION**

The Due Process hearing for G       Ar       was heard by the Hearing Panel consisting

of the following individuals: (a) Janell S. Ostroski, Esquire, Chair; (b) Janice Hoffman-Willis,

Ph.D.; and (c) John Werner. The original complaint was filed with the Department of Education

on or about August 31, 2004. A decision on that complaint was issued in 2005 in favor of the

Indian River School District. Parents appealed that decision to the Family Court of Sussex

County. The Family Court of Sussex County issued its decision on that appeal on or about

January 19, 2007, reversing the decision of the Due Process Panel and remanding the matter for

further findings and a decision not inconsistent with its holding. The same panel was appointed

on remand as was appointed on the original complaint.

A teleconference took place on May 2, 2007, with the parties and all panel members

present. There was argument presented with respect to what evidence the panel needed to hear, if

any. As the panel never heard evidence on the issue of whether the District failed to identify the

child for special education services in a timely fashion at the first hearing, it was appropriate for

the panel to review all evidence and hear all testimony on that issue. A hearing was scheduled to hear this new testimony and review this new evidence.

However, as the panel had heard evidence on the issue of the appropriateness of the IEP at the first hearing in 2005 for five (5) days, the panel determined that it was not necessary to hear evidence on this issue as the panel could review the record to make this decision. Nonetheless, the parties were permitted to argue this issue in their closing argument. The Family Court's decision specifically gave the panel discretion in this area. (J. Millman's decision dated January 19, 2007, emphasis added.)

Finally, the panel specifically permitted the parties to provide evidence, testimony, and/or argument on any proposed remedy and the appropriateness of the remedy in light of the fact that two years had passed since the close of the evidence and almost three years had passed since the child was removed from the school district.

The hearing was scheduled for May 24, 2007, from 9:00 a.m. until 3:00 p.m.; May 30, 2007, from 9:00 a.m. until 1:00 p.m.; June 19, 2007, from noon until 5:00 p.m.[1]; and June 20, 2007, from 9:00 a.m. until 5:00 p.m. The District presented its case and rested at the conclusion of the hearing of May 30, 2007. Parents cross-examined the District's witnesses and did direct examination of some of the District's witnesses. Parents were expected to present their case on June 20, 2007. On June 15, 2007, the chair person received an e-mail from mother indicating that the parents were choosing not to present any additional witnesses and rested their case. The parties had elected to submit their closing arguments in writing after the final transcripts were sent out by the DOE. Closing arguments were due July 17, 2007.

---

1    This date was later changed to June 21, 2007 from 9:00 a.m. until 3:00 p.m. to accommodate a conflict in the chair person's schedule.

2

The following individuals were designated as representatives of the respective parties:

**For Indian River School District:**

James H. McMackin, III, Esquire
Morris, James LLP
500 Delaware Ave.
Wilmington, DE 19801

**For G:        A**

William and Maureen Anello
362 Alba Court
West Grove PA 19390

### REFERENCES AND DEFINITIONS

Throughout this decision the following references and definitions will be used:

1. At the beginning of these proceedings in 2007, the parents refused the chair person's offer to change the student's name in the record for confidentiality reasons. T-4-6 (5/24/07). Nonetheless, William and Maureen Anello may be referred to collectively and individually as the "parents". In some instances, for example, only one parent may have attended a meeting but this decision may still refer to the parents in the plural. Actions and decisions of either parent were considered to represent the position of both parents. Therefore, the singular and plural use of this word is not critical. References to "the mother" refer to Maureen Anello. References to "the father" refer to William Anello.

2. Gᵢ    Aⱼ    nay be referred to as "the student".

3. Indian River School District will be referred to as the "District".

4. Exhibits will be referred to as 05PE-1, (2005 Parent Exhibit 1, 2, etc.) 07DE-1, (2007 District Exhibit 1, 2, etc.)

5. References to the hearing transcript will be cited as "T-____ (date of hearing)", e.g., T-1 (1/20/05).

6. After identifying the witnesses, they may be thereafter referred to by last name.

7. Due Process will be referred to as "DP".

8. Free Appropriate Public Education will be referred to as "FAPE".

9. Individual Education Plan will be referred to as "IEP".

10. Occupational Therapy will be referred to as "OT".

11. The State of Delaware Department of Education will be referred to as "DOE".

12. Lord Baltimore Elementary School will be referred to as "LBES".

13. Lighthouse Christian School will be referred to as "LCS".

## SUMMARY OF ISSUES

The issues to be decided on remand were as follows:

1. Did the Indian River School District timely identify the student as a student eligible for special education, and thus timely provide her with an IEP?

2. Was the IEP for the 2004-2005 school year reasonably calculated to provide the student with a free, appropriate public education?

3. If the Indian River School district failed to satisfy either obligation, what is the appropriate remedy?

## EXHIBITS

The Exhibits from the 2005 hearing for both the District and the Parents were re-submitted during the 2007 hearing.

The 2007 Exhibits of the Indian River School District were admitted with the following objections:

1. Parents objected to District's Exhibit Number 1 based on the fact that it is one page from District's Exhibit Number 5 in 2005. The objection was denied as there was no harm in admitting one page again.

2. Parents objected to District's Exhibit Number 2 in 2007 based on the fact that is the same as District's Exhibit Number 14 in 2005. The objection was denied as there was no harm in admitting the document again.

3. Parents objected to District's Exhibit Number 4 based on the fact that it was the same as District's Exhibit Number 15 in 2005 except that it was missing page 1.

5

The objection was denied and noted for the record.

4.   Parents objected to District's Exhibit Number 5 based on relevance. Upon further questioning, Mother admitted the information with respect to this document was already in evidence. The objection was denied but noted for the record.

5.   Parents objected to District's Exhibit Number 6 based on the fact that no witness was identified who was listed on the document and that some of the pages were duplicates of evidence submitted in 2005. The District argued it was a business record. The objection was denied.

6.   Parents objected to District's Exhibit Number 7 based on the fact that it is the same as District's Exhibit Number 31 and Parents' Exhibit 47 in 2005. The objection was denied as there was no harm in admitting the document again. There was also an objection on the grounds of relevance. The District argued it was offered for impeachment purposes. The objection was denied.

7.   Parents objected to District's Exhibit Number 8 based on relevance. The objection was denied.

8.   Parents objected to District's Exhibit Number 9 based on relevance. The objection was denied.

9.   Parents objected to District's Exhibit Number 10, 11, and 12 because they were incomplete documents. The District agreed to remove them as they were already in evidence in the 2005 binder. As they were removed from the record, the issue of admissibility was moot.

10.  Parents objected to District's Exhibit Number 13 based on the fact that it is the

6

same as District's Exhibit Number 24 in 2005. The objection was denied as there was no harm in admitting the document again.

The Exhibits for the student were admitted noting the following:

Every document submitted by the parents was dated subsequent to the events which lead to the parents filing their due process complaint in 2004. The panel explained to the parents that documents from 2006 and 2007 would not be relevant to a case which was based on facts that occurred in 2003 and 2004. The parents asserted that Exhibit Numbers P-6, P-7, and P-8 were submitted to support their proposed remedy. The panel allowed these documents to be entered into evidence believing that the author would be testifying about her recommendations. This witness was never presented. The panel allowed the remaining documents only to protect the parents' right to appeal but made it clear that the panel believed they were not relevant. No witnesses were presented to authenticate these documents. The panel raised this issue sua sponte after receiving the Parents' documentary evidence in an attempt to alert the parents about this problem as soon as possible.[2] However, the panel made the aforementioned decision after oral argument on this issue at the beginning of the hearing.

## STATEMENT OF THE POSITIONS OF THE PARTIES

Indian River School District

The District asserts that it timely identified the student as a child with a disability in need of an IEP and that the proposed IEP was appropriate. It further asserts that as there was no violation of

---

2        See chair person's letter dated May 18, 2007, which is part of the record being submitted to the DOE.

the IDEA under either issue, there is no need for a remedy. In the event the panel were to find

that the District had violated the IDEA, the District proposes that the appropriate remedy should

be limited to compensatory services calculated based on specific findings as to when the

deprivation of educational benefit began; when the District knew or should have known of the

deprivation; and how long the District reasonably had to correct the problem.

### Parents

The parents assert that the District failed to identify the student as a child with a disability in

need of an IEP in a timely fashion and that the proposed IEP was not appropriate to address the

student's unique needs. The parents assert that the appropriate remedy is for the District to

reimburse the parents for the tuition and related expenses of the Lighthouse Christian School for

the 2004-2005 school year and for the District to provide as compensatory education for the

2003-2004 school year all related costs for enrollment in an intensive remedial language based

program designed to address all of the student's unique needs in a small group setting and

continuing until such time as the student's achievement is commensurate with her age

appropriate peers.

## **FINDINGS OF FACT**

1.    Prior to her enrollment in the IRSD, the student had attended public school in White
      Plains, New York where she had received accommodations under a 504 Plan. (05DE-
      4; 05PE-17).

2.    On 12/20/03, six months before the child was enrolled in the IRSD, the school district

8

in White Plains, New York, after considering a social history, classroom observations, teacher reports, a psychological evaluation, a speech/language evaluation, an audiological evaluation, an OT evaluation, and a physical examination, determined that the student was not eligible for special education services. (05PE-11).

3.  On 6/13/03, the student was enrolled in third grade at LBES in the IRSD. 05DE-2.

4.  In 9/03, the student began attending third grade at LBES and Connie Warner was her assigned regular education teacher. T-8 (2/24/05).

5.  On 9/22/03, an initial conference was held to review the NY 504 Plan and it was determined that the student would remain on a 504 Plan. The team established classroom accommodations at this conference. The parents were part of this team and agreed to the accommodations. 05DE-5; 05PE-18.

6.  Following the conference, the parents requested and gave permission for an OT evaluation. 05DE-5.

7.  On 9/25/03, Eleanor Gregory performed an OT evaluation and concluded that direct OT was not needed but that the OT would consult with the teacher if the teacher felt it was indicated. (05DE-7). Gregory believed that the 504 Plan adequately addressed the weaknesses in visual perception and visual motor skills indicated by the OT evaluation she performed. T-80-94 (2/15/05).

8.  Results of the OT evaluation were discussed at a conference on 10/15/03 and it was decided that Gregory would consult with Warner on an as needed basis up to two times per month. The mother was present for said meeting. 05DE-10; T-112 (1/20/05); T-17-18 (1/24/05).

9

9.   The parents argued in the hearing that Gregory was instructed to perform a "sensory
     awareness" (tactile and vestibular) evaluation and that she did not perform a sensory
     motor evaluation as requested. 05DE-5; T-100 (2/15/05); T-9 (2/15/05). There is no
     evidence to support this position.

10.  Warner gave the mother her home phone number and encouraged her to call if there
     was a problem. She talked to the mother by phone and met with her when the mother
     asked to meet with her. She testified that they had at least two phone conferences and
     five meetings. T-19-20 (1/24/05).

11.  As of 10/2/03, the student's mid-marking period progress report for the first quarter
     indicated her grades were 65 in Math, 70 in Reading, 76 in English and 74 in Spelling
     on a scale where 70 or above is a passing score. Her handwriting was marked
     satisfactory (S). 05DE-8; PE-20.

12.  The student's first marking period report card indicated that she scored 70 or above
     on all of her core subjects except for a 63 in Math. 05DE-11; T-39 (1/24/05).

13.  Mother admitted that the curriculum at LBES was harder than the curriculum at the
     student's school in New York. 05DE-14.

14.  The services recommended by district officials to improve the student's educational
     performance during the later half of the first marking period were provided at the
     parents' expense. The student received instruction from Sylvan Learning Center two
     times per week and private tutoring by Jessica Norwacki one time per week. 05DE-
     14; T-39 and 52-54 (2/24/05).

15.  On 12/8/03, mid-marking period progress report for the second quarter revealed the

10

student's grades improved slightly and were 80 in Reading, 70 in Math, 76 in English, and 85 in Spelling. However, she received unsatisfactory remarks from her teacher in areas such as Expected Behaviors and Works Independently. 05DE-10; 05PE-22. This was the same time period when the student was receiving services outside of school as arranged by the parents.

16.    The student's grades for the second quarter showed that she scored 70 or above in all subjects except math which was a 68. 05DE-28.

17.    Warner had prior experience working with children with auditory processing issues as her own daughter had the same disability and she had also been a regular education team teacher with Jan Drake, a special education teacher at LBES, for 4 years. In that setting, they had worked with children with auditory processing issues. T-11 (2/24/05).

18.    Warner used a multi-sensory approach in the classroom. T-11 (1/24/05).

19.    The parents never expressed dissatisfaction with Ms. Warner's teaching efforts nor did they ask her to modify the classroom accommodations. T-13-14, 34 (1/24/05).

20.    Warner referred the student to the Host Mentoring Program and to a small group reading program which were both pull out programs done during the school day to address her reading problems. The parents removed the student from these interventions without teacher advisement because they believed the student should be in the classroom with Warner. T-41-42 (1/24/05).

21.    In January, 2004, an independent OT evaluation was performed by J. B. Haughey of Easter Seals, at the expense of the parents, recommended therapy two times per week

11

05DE-12.

22.   Haughey never contacted the classroom teacher and was unable to give an opinion as to whether the Easter Seals OT objectives had any relationship to the work the student was doing in school because she had never observed her in the school setting.  T-291 (2/15/05).

23.   On 2/3/04, before a 504 meeting, parents received a letter from the district notifying them that the student was in danger of retention because she had not met the criteria for Math.  05DE-13.

24.   At the 2/3/04 meeting, the mother requested further evaluations in the areas of achievement and personality.  05DE-14.  A Conner's Rating Scale was completed by the teacher and parent.  A Conner's Rating Scale is a behavior rating scale and not a personality test.  There was no evidence presented to prove that an achievement or a personality test was performed as a result of mother's request at this time.

25.   The student's 2/25/04 mid-marking period progress report for the third quarter indicated she scored above 70% on all of her core subjects, that her handwriting was satisfactory, and that she was complying with all expected behaviors.  05DE-16; 05PE-26.

26.   The student's grades for the third quarter showed that she scored greater than 70 in all subjects except math where her grade was a 67.  05DE-28.

27.   On 3/3/04, a 504 conference was held to discuss the student's grades and recent testing by the District's speech pathologist, Paula Howard.  (05DE-18; 05PE-27).  It was agreed that she would take the State test in a small group with additional time and

12

emphasis on re-reading and re-focusing. The minutes show the student was using the Earobics program at that date. T-48 (1/24/05).

28.  On 3/11/04, the student took the State test (DSTP) and scored below the standard required for promotion to fourth grade. 05DE-19.

29.  On 4/28/04, the parents sent an e-mail memo to Darlene St. Peter, the District's Special Education Director, which acknowledged that the student would be retained in third grade, but asked for a team room setting and a "full educational, psychological, speech and language (please include auditory processing); neurological and physical/occupational assessments". 05PE-31.

30.  The 5/4/04 mid-marking period progress report for the fourth quarter showed that the student scored 61 in Reading, 61 in Math, 68 in English, and 78 in Spelling, satisfactory in all but one expected behavior, and satisfactory in her ungraded subjects, including handwriting. 05DE-21; 05PE-33.

31.  On 5/18/04, Charles Rechsteiner performed a psycho-educational assessment. The test revealed that the student is of average intelligence, with average cognitive skills except in the area of visual-spatial reasoning with abstract concepts and pattern recognition. She scored in the average range on word identification. However, in reading comprehension she scored on a grade equivalent (GE) level of 1.8 years representing a severe discrepancy from her ability as indicated on the intelligence and achievement tests. 05DE-36. Rechsteiner recommended that an IEP team meet and determine whether the student qualified for special education services as a child with a learning disability. 05DE-36.

13

32.  On 5/26/04, the District notified the parents that the student did not meet the State standards in Reading and Math and offered her a two week remedial course called "Immersion in Learning" that was tailored to address the Reading and Math deficits indicated on the DSTP.  05DE-37.

33.  On 5/28/04, the parents notified the District that they did not want the student removed from her regular classroom to participate in the Immersion in Learning Program because they wanted her in the classroom with Warner as much as possible. 05DE-38.

34.  Warner and Rhonda Lynch (school guidance counselor) testified that in late May 2004, the student told them she would be attending LCS in September, 2004.  T-263, 267 (1/20/05); T-56 (1/24/05).

35.  On 6/2/04, an IEP team meeting was scheduled for 6/11/04 to meet and discuss the student's special education needs.  On 6/3/04, the parents completed an IEP input form on which they listed the student's areas of weakness as reading comprehension and math.  They noted she was failing although "she has been tremendously supported throughout the school."  05PE-39.

36.  The parents took the student to Dr. Blackburn, OD, for visual testing.  He issued a report to the local referring optometrist dated 6/4/04 indicating problems with eye coordination, eye convergence and eye tracking.  He prescribed glasses and 18-24 hours of vision therapy in his office with supplemental home therapy.  A separate 6/6/04 report to the parents addressed a bottom line deficit in site word decoding and suggested a multi-sensory structured reading program using phonetic principles.

(05PE-40).

37.  The meeting scheduled for 6/11/04 was rescheduled to 6/14/04. At that meeting, Rechsteiner reviewed the results of his assessment and his recommendation that the student had a mild learning disability in reading comprehension based on the guidelines contained in AMSES. T-214, 220 (1/20/05).

38.  On 6/14/05, the parents accepted the recommendation of the District's psychologist (Rechsteiner) that the student was learning disabled in reading comprehension based on a severe discrepancy between ability and achievement. 05DE-27; 05PE-43. The IRSD team classified the student "Learning Disabled" as a student with a disability in reading comprehension. 05DE-27. There was no evidence presented at either hearing indicating that the parents disputed the fact that the student was learning disabled in reading comprehension only and not learning disabled in math as well.

39.  At this point, the team, including the parents, agreed that the student would be retained in third grade in a team room setting with a certified special education teacher. 05DE-27; 05PE-43. This decision was consistent with Mother's letter of 4/28/04 where she requested a team room setting. 05PE-31.

40.  After the 6/14/04 meeting, Drake, who was then the special education coordinator, prepared a proposed IEP. The proposed IEP was considered at the team meeting on 7/9/04. 05DE-29; T-223 (1/20/05).

41.  At the 7/9/04 IEP meeting, the IEP team discussed classroom accommodations which included a soundfield system to address the student's disability in reading comprehension but also discussed accommodations to address math reasoning,

15

decision as to whether the student would be attending LBES in the upcoming school
year. 05DE-29.

43.    Twelve days later, on 7/21/04, the mother went to LBES and met with Janet Hickman.
       She signed the IEP indicating that she did not agree with the proposed plan or the
       proposed placement. 05DE-30; T-172 (1/24/05).

44.    The parents enrolled the student in LCS on or about 8/3/04 when they paid her annual
       tuition for the 2004-05 school year. 05DE-46.

45.    On 8/20/04, prior to the start of the 2004-2005 school year, the parents sent Hickman
       a certified letter informing her that the student would be attending LCS because LBES
       had failed to provide a concise plan on how to address the student's learning disability
       and gave four reasons to support their conclusion. (05DE-31; 05PE-47). The four
       reasons stated in the letter are identical to paragraphs (5) through (8) of the parents'
       letter requesting a due process hearing. 05DE-1; 05PE-47.

46.    October 1, 2004, the student's grades from the LCS were: Math 92; Reading 84;

16

History 97; Spelling 98; Science 96; Handwriting 92; Bible 95; Language 89. (05PE-49). There was no evidence presented that the programs at LCS and LBES were comparable. Therefore, the panel could not compare the student's progress in the two schools. 05PE-49

47.    There was evidence presented that the student was receiving none of the services at LCS that the parents were requesting be provided by LBES. T-13-21, 72-75 (3/15/05). However, she was receiving excellent grades.

48.    There was also evidence presented that the parents did not fill the student's eye glass prescription until September, 2004, and that she was not wearing the eye glasses at school in LCS. T-15-16 (3/15/05); T-47 (3/15/05);

49.    Parents presented no non-hearsay evidence as to the amount of money they are requesting to be reimbursed for private school placement or related costs for enrollment in an intensive remedial language based program designed to address all of the student's unique needs in a small group setting and continuing until such time as the student's achievement is commensurate with her age appropriate peers.

## DISCUSSION

**1.    Did the Indian River School District identify G        as a student eligible for special education, and thus timely provide her with an IEP?**

The District has the responsibility of identifying children who are in need of special education services. 14 Del. C. Sec. 3122. The IDEA requires a local public school district to develop an Individualized Education Program ("IEP") that is designed to ensure FAPE for every

17

child identified as eligible for special education due to a disability,. *S.H. v. State-Operated Sch.*

*Dist. of Newark*, 336 F.3d 260, 264 (3d Cir. 2003). The District has the burden of proving the

IEP is appropriate but does not have to prove the inappropriateness of any alternative placement.

*Carlisle,* 62 F.3d at 533. But first, in order to be eligible for an IEP, a child must qualify for

services as a child with a disability as defined by state law. 20 *U.S.C.A.* § 1414(d)(1)(A).

　　　The Delaware Department of Education has issued the *Administrative Manual for Special*

*Education Services ("AMSES")*, as a means to satisfy the state's responsibilities under the IDEA.

*AMSES* at Preface. Pursuant to *AMSES*, a "child with a disability" means:

> [A] child evaluated in accordance with [the provisions of *AMSES*]
> as having mental retardation, a hearing impairment including
> deafness, a speech or language impairment, a visual impairment,
> including blindness, serious emotional disturbance..., an
> orthopedic impairment, autism, traumatic brain injury, an other
> health impairment, *a specific learning disability,* deaf-blindness, or
> multiple disabilities, *and who, by reason thereof, needs special*
> *education and related services.* (emphasis added.)

*AMSES,* at 25; *see also,* 20 U.S.C. § 1401(3)(A). *AMSES* further provides that, a school district

must refer a child to its Instructional Support Team before testing for special education services

> [The] referral to the school's instructional support team is a
> process where teachers enlist the help of the team to assist in the
> identification of potential instructional strategies or solutions for
> learning and behavior problems. The instructional support team
> process may or may not lead to referral for initial evaluation to
> determine eligibility and possible need for special education
> services. Documentation of the process should be comprehensive
> (including baseline and outcome data) and include strategies such
> as: curriculum based assessment, systematic observation,
> functional assessment, current health information and analyses of
> instructional variable. Id at 11.

18

In this case, the IRSD identified this student as a student with a learning disability in reading comprehension after conducting a full psycho-educational evaluation on May 24, 2005. The parents assert that the IRSD did not timely identify the student. It is unclear to the panel whether the parents assert that the child is learning disabled in other areas in addition to reading comprehension or if they assert that the IRSD simply failed to identify the student in a timely fashion.

We will first review whether the child should have been identified as learning disabled in math as well as reading comprehension. The psycho-educational testing done by the school district in May, 2004, showed a severed discrepancy in reading comprehension only. The parents presented no non-hearsay testimony to show that the child also had a severe discrepancy in math as well. Therefore, the panel has no evidence to find in favor of parents on this issue.

Second, we will review whether the IRSD timely identified the student as a learning disabled in reading comprehension. The student was enrolled in the IRSD in June, 2003, and began school in September, 2003, with a 504 Plan. It is significant to note that the student came to the IRSD with a file from her previous school in White Plains, New York. In that file, it was noted that, as of December 20, 2002, six months before being enrolled in IRSD, the student was determined to <u>not</u> be eligible for special educational services based on, among other things, a psycho-educational exam completed in September, 2002. Finally, it is important to note that the student had recently moved to the area and was adjusting to a new home, new friends, and a new school and that the IRSD's curriculum was harder than her previous school, according to her mother.

A 504 team was convened and met within the first few weeks of school and wrote a new

19

504 Plan for the student. An OT evaluation was conducted on September 25, 2003. The evaluation showed that the student scored low on the visual-perception evaluation but that OT intervention on a pull out basis was not indicated at that time. The difficulties were addressed in the 504 Plan. The evidence was that, within the first two semesters of school, the student was offered and used the Earobics program, that the student was offered the Host mentoring program but the parents withdrew her from the program, that the student was offered a small reading group but the parents withdrew her from the program, that the parents procured services from Sylvan Learning Center at their own expense, that the parents hired a tutor at their own expense, and that the parents obtained OT services through Easter Seals at their own expense[3]. By the second marking period, the student was showing improvement. However, in the third marking period, the student's grades began to decline. This time coincided with a time period when her brother may have been ill[4], there was a death in the family, and father was out of the home on business much of the time. All of these factors, could affect a child's learning. If this was the only evidence presented, the panel could have found that it was reasonable for the IRSD to have not performed a psycho-educational evaluation of the child until May, 2004, after mother requested the evaluation on April 28, 2004, as a team had been offering instructional strategies to assist the student.

However, in reviewing the record, it was evident that there was a meeting on February 3, 2004, at which time the mother requested further evaluations to rule out other problems. She

---

3    After the district learned that the student failed the DSTP test in March, 2004, the student was offered the Immersion in Learning Program and the parents refused that service. The student was also offered summer school and the parents refused that service as well. Either of these programs could have helped the student pass the third grade and the DSTP.

4    We say "may have been ill" because the evidence was that the student was telling teachers and her

20

signed a consent for personality testing and achievement testing. The panel finds that there were no red flags prior to this point that the IRSD should have seen that would have required them to conduct an evaluation at this time. However, since mother requested the testing, the testing should have been done within forty-five (45) school days or ninety (90) calendar days. See, *Section 3.1 of Delaware Department of Education Regulations*, AMSES. The panel could find no evidence that the personality or achievement testing was done as a result of mother's request in February, 2004. It appears the testing was only done after mother's second request in April, 2004. If the IRSD had done the testing in a timely manner after mother's first request, the panel can assume that the IRSD would have found the same learning disability that it found when the psychologist completed his testing in May, 2004. Therefore, the panel finds that the IRSD did not timely identify the student because it failed to honor mother's request for testing in February, 2004.

## 2. Was the IEP for the 2004-2005 school year reasonably calculated to provide G with a free, appropriate public education?

The District bears the burden of proving the appropriateness of the program and placement proposed. *Oberti v. Bd. of the Borough of Clementon Sch. Dist.*, 995 F.2d 1204 (3d Cir. 1993); *Fuhrman v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1035 (3d Cir. 1993). Both federal law, through the IDEA, and state law at 14 Del. C. § 3120 obligate the District to provide the student with a free, appropriate public education ("FAPE"). The Supreme Court has interpreted IDEA's mandate to provide a FAPE to require the District to provide an education "tailored to the unique needs of a handicapped child by means of an 'individual education

---

counselor that her brother was ill and had been in the hospital but mother told the panel that this was not true.

program' ("IEP"). *Bd. of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). The child's program should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade; the education provided must be "sufficient to confer some educational benefit." *Id.* at 176. Although there has been no specific definition of what is meant by "meaningful", the Third Circuit Court of Appeals requires an "educational benefit" to be "more than a trivial benefit or *de minimis* educational benefit." An IEP must confer "significant learning" and "meaningful educational benefit." *Ridgewood v. Bd. of Educ.*, 172 F. 3d at 247; *Carlisle Area Sch. Dist.*, 62 F.3d at 533-534; *Oberti*, 995 F.2d 1204, *Polk v. Central Susquehanna Intermediate Unit,* 853 F.2d 171, 180 (3d Cir. 1988);

At the same time, there is no requirement the school district maximize the potential of a child. *Rowley*, 458 U.S. at 198. School districts are not obligated to provide a child with the best education, public or private, that money can buy. *Steinberg v. Weast*, 34 IDELR 113 (D. Md. 2001). Nor does the IDEA require a school district to maximize each child's potential commensurate with the opportunities provided to other children. *Rowley,* 458 U.S. at 198. Rather,

> The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal education; it requires an adequate, rather than an optimal IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

*Rowley*, 458 U.S. at 198. *Rowley* does not require the District to provide an optimal level of

22

services, or even a level of services, which would confer additional benefits, because the IEP required by the IDEA represents only a "basic floor of opportunity." *Id.* at 176; *Carlisle*, 62 F.3d at 533. The Sixth Circuit analogized that the IDEA does not require the educational equivalent of a "Cadillac," but only requires the equivalent of a "serviceable Chevrolet." *Doe v. Bd. of Educ. of Tullahoma City Schools,* 9 F.3d 455, 459-460. The District has the burden of proving the IEP is appropriate but does not have to prove the inappropriateness of any alternative placement. *Carlisle,* 62 F.3d at 533.

In May, 2004, after the student was identified as a student with a disability entitled to educational services, the staff at LBES quickly assembled a team which included the parents. They convened meetings on June 14, 2004, and July 9, 2005. After initially agreeing with the team at the first two meetings, the parents changed their mind and chose to enroll the student in the LCS. The parents notified the school of their decision when mother met with Hickman one-on-one on July 21, 2004. The team was not present and, therefore, could not address mother's concerns about the proposed IEP. Unfortunately, it does not appear that the IRSD attempted to contact mother to resolve the matter or to ascertain why mother was not in agreement with the proposed IEP. Almost a month later, Mother wrote a letter to the district listing her concerns about the proposed IEP. But by that time the parents had already withdrawn the child from IRSD and paid the tuition for the student to be enrolled in the LCS. Eleven days later, the parents filed their due process complaint.

This is a very difficult and unfortunate case. It was clear to the panel that the staff of the LBES was dedicated to helping the student succeed and honestly believed they were doing what they thought was the best plan for this student. The parents just wanted more for their daughter,

23

as any good parent would. It is very possible that if the parents had just requested another team meeting to address their concerns rather than just abruptly signing the IEP indicating that they disagreed with the proposed IEP, the IRSD would have changed the IEP to satisfy the parents. However it is important to note that the parents had already refused the Host Mentoring Program, the small group reading class the Immersion in Learning Program and summer school, all of which may have helped this student succeed. Instead, they chose to use services outside of the school such as Sylvan Learning Center and a private tutor. And, they chose to use Easter Seals for OT when it was not specifically designed to have an educational benefit. A proposed IEP is a work in progress. If the parents had made suggestions before rejecting the plan, there could have been a completely different outcome to this case.

Nonetheless, this panel is required to make a decision as to whether the proposed IEP was reasonably calculated to provide the student with a free, appropriate public education. And, in this case, the panel agrees that the IEP, while it could have used some modifications to be better, it is reasonable to believe that the student would have received meaningful educational benefit from the plan. The accommodations from the 504 plan were listed in the plan but there were additions as well. The student was going to be in a team classroom with a special education teacher in that room for 12.5 hours per week. There was discussion and plans to help the student with areas outside of her reading comprehension disability. The plan addressed math reasoning, staying on task, anxiety, visual processing, grapho-motor inefficiencies, and her need for movement in the classroom. There were notes reflecting that Mother would meet with the OT to develop a plan to meet the student's needs. This plan was a work in progress. The working draft was a very good start and the student could have received meaningful educational benefit

24

from this plan as written. If the parents wanted more from the district, they needed to make their suggestions in a team meeting where the team could consider their suggestions. The school district's plan does not have to be a "Cadillac". They needed to provide a working Chevrolet. And they did that in this case.

## 3.    If the Indian River School district failed to satisfy either obligation, what is the appropriate remedy?

With respect to the first issue, the panel has found that the IRSD failed to identify the student in a timely manner when it failed to conduct the evaluations that mother requested in February 3, 2004. If the school district had acted on this request, according to the DOE's regulations, it would have had forty-five (45) school days or ninety (90) calendar days to complete the evaluation or until approximately April 7, 2004. After the testing, an IEP team would have met to determine that the student was learning disabled and eligible for services. Given that spring break fell during this time, it is reasonable to expect that the school would have met within three weeks of the testing or by April 20, 2004. After the team had met to determine eligibility, a second meeting would have been scheduled to review a proposed IEP. Pursuant to the DOE's regulations, the District would have had to meet within thirty (30) calendar days of determining eligibility or by May 20, 2004. Therefore, assuming the testing had been completed following mother's first request, the panel finds that the student could have been receiving services as early as May 20, 2004.

The panel finds that the district would have been the appropriate placement for this child. Therefore, reimbursement of private school placement is denied. The panel further finds that the

25

OT the student was receiving from Easter Seals was not necessarily designed to provide an educational benefit. Therefore, it would not be appropriate to reimburse the parents for this expense. However, the parents were paying for Sylvan Learning Center and a private tutor for the student. The IRSD shall reimburse the parents the out of pocket expenses they incurred with Sylvan Learning Center and the private tutor for the period of time from May 20, 2004, through the end of the 2003-2004 school year. Parents shall provide verification of these out of pocket expenses in the form of bills or canceled checks to the district's counsel within thirty (30) days of the date of this decision. The district then has thirty (30) days to reimburse the parents the amount of the expenses. If the parents do not provide verification of the expenses in a timely manner, the district has no obligation to reimburse them.

As the panel found that the IEP was reasonably calculated to provide meaningful educational benefit to the student, no remedy is required with respect to the second issue.

## DECISION AND RELIEF

The District failed to identify the student as a student in need of special education services in a timely manner for the reasons more specifically stated above.

The proposed IEP was reasonably calculated to provide the student with meaningful educational benefit for the reasons more specifically stated above.

The request for private placement is denied as the appropriate placement for this child was in the IRSD. The IRSD school shall reimburse the parents for out of pocket expenses as more specifically stated above.

26

## RIGHT TO APPEAL

The decision of the Due Process Hearing Panel is final. An appeal of this decision may

be made by any party by filing a civil action in the Family Court of the State of Delaware or

Untied States District Court within ninety (90) days of the receipt of this decision. 20 U.S.C.

1415 (i) (2) (A). 14 *Del. C.* Sec. 3142 (a).

Dated: _____8/1/07_____

Janell S. Ostroski, Esquire,
Chairperson

Dated: _____8/1/07_____

Janice Hoffman-Willis, Ph.D.

Dated: _____8/1/07_____

John Werner

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** A by and through her parents Maureen + William Anello 362 Alba St. West Grove, PA 15390 484-527-8162

**DEFENDANTS** Indian River School District served on Susan S. Bunting (officially) 31 Hoosier St, Selbyville, DE 19975 and Susan S. Bunting (officially) Super. of Schools, I.R.S.D.

**(b)** County of Residence of First Listed Plaintiff Chester Co, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Sussex County DE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorneys (Firm Name, Address, and Telephone Number) Pro se litigant

Attorneys (If Known) James McMackin, III Morris, James, LLP 500 Delaware Ave Suite 1500 Wilmington DE 19801-1494

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☐ 3   Federal Question (U.S. Government Not a Party)

☑ 2   U.S. Government Defendant

☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                          and One Box for Defendant

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Med. Malpractice | ☐ 625 Drug Related Seizure 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury - | of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability   Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine   **PERSONAL PROPERTY** | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product / ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability / ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment   Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/   **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations / ☐ 530 General | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty |  |  | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | Under Equal Access |
|  | Employment / ☐ 550 Civil Rights |  |  | to Justice |
|  | ☑ 446 Amer. w/Disabilities -   ☐ 555 Prison Condition | ☐ 950 Constitutionality of |
|  | Other | State Statutes |
|  | ☐ 440 Other Civil Rights |  |  |  |

## V. ORIGIN   (Place an "X" in One Box Only)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
§504 and 20 U.S.C. §1400 et. seg.
Brief description of cause:
appeal of Dept. of Education Due Process hearing

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 128,500.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
Anello v Indian River School District File# CS05-02707
JUDGE Kenneth M. Millman   DOCKET NUMBER Petition# 05-32107

DATE 8/20/07   SIGNATURE OF ATTORNEY OF RECORD Maureen Anello Pro se litigant

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

0 7 - 5 0 8

Civil Action No. _____

## ACKNOWLEDGMENT
## OF RECEIPT FOR AO FORM 85

### *NOTICE OF AVAILABILITY OF A*
### *UNITED STATES MAGISTRATE JUDGE*
### *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____2_____ COPIES OF AO FORM 85.

8/20/07
(Date forms issued)

X _Maureen Anello_
(Signature of Party or their Representative)

X Maureen Anello
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action